IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

TERESA D. HUGHES,

     Plaintiff,

v.                                         CASE NO. 1:10-cv-154-MP-GRJ

MICHAEL J ASTRUE, Commissioner
of Social Security,

     Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals from a final decision of the Commissioner of Social Security ("the Commissioner") denying her applications for a period of disability and disability insurance benefits. (Doc. 1).   The Commissioner has answered (Doc. 8), and both parties have filed briefs outlining their respective positions. (Docs. 15 & 18). For the reasons discussed below, it is recommended that the Commissioner's decision be **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for disability benefits on December 11, 2002, alleging a disability onset date of July 20, 1999, due to fibromyalgia, chronic fatigue disorder, major depressive disorder, nerve damage, edema, and chronic pain in her head, neck, back, pelvis, thighs, knees, feet, and legs. (R.58-60, 67.)  Plaintiff's application was denied initially and upon reconsideration.  (R.33-34.)  Plaintiff petitioned for a hearing before an administrative law judge (ALJ), who conducted a hearing on May 31, 2005,

and entered an unfavorable decision on July 26, 2005. (R.16-29.)  The Appeals Council denied Plaintiff's request for review on December 11, 2006 (R.7-12.)  Plaintiff then filed a complaint for judicial review.  On motion of the Commissioner, this Court entered an order on June 21, 2007 remanding the case to the ALJ for consideration of Plaintiff's residual functional capacity given her limitations regarding her ability to deal with the general public, co-workers, and supervisors.  (R.619-28)  Following a second administrative hearing on October 15, 2007, the ALJ  entered an unfavorable decision on November 27, 2007. (R.590-604.)  Plaintiff filed a complaint for judicial review of the November 2007 decision.  On motion of the Commissioner, this Court entered an order on January 29, 2009, remanding the case to the ALJ for additional proceedings. (R.796-800.).  A third hearing was conducted on December 2, 2009, and the ALJ entered an unfavorable decision on April 17, 2010 (R.782-95.)  This action followed.

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1]  Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

---

[1] *See* 42 U.S.C. § 405(g) (2000).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* Edwards v. Sullivan, 937 F.2d

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6]  The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which

_____

580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; *accord,* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8]  First, if a claimant is working at a substantial gainful activity, he is not disabled.[9]  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.[10]  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled.[11]  Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled.[12]  Fifth, if a claimant's impairments (considering his residual functional capacity ("RFC"), age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant

---

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

[12] 20 C.F.R. § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

work initially lies with the plaintiff.[14]  The burden then temporarily shifts to the

Commissioner to demonstrate that "other work" which the claimant can perform

currently exists in the national economy.[15]  The Commissioner may satisfy this burden

by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive

determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the Grids when "the claimant

has a non-exertional impairment which significantly limits his or her basic work skills or

when the claimant cannot perform a full range of employment at the appropriate level of

exertion."[17]  In a situation where both exertional and non-exertional impairments are

_____

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F.
3d 1274, 1278 (11th Cir. 2001).

[15] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[16] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[17] Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996). See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19]  Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence.[20]  Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

### III.  SUMMARY OF THE RECORD

#### A.   **Personal Background**

Plaintiff was 50 years old at the time of the most recent hearing. She completed one year of college and has past relevant work as a word processing specialist (R.1033.)  The Plaintiff has not engaged in substantial gainful activity since her alleged onset date of July 20, 1999 through her last insured date of December 31, 2004 (R.784.)

#### B.   **Medical Background**

*1.  Emergency Care*

---

[18] Walker, 826 F.2d at 1003.

[19] Wolfe, 86 F.3d at 1077-78.

[20] *See id.*

Plaintiff presented to the emergency room at North Florida Regional Medical Center on April 1, 2000, complaining of pain and spasm in her left trapezius area, twitching and spasms in her left arm, and persistent neck and back pain.  Plaintiff also complained of bilateral upper and lower extremity edema for the previous two days. She requested pain medications repeatedly and was given Demerol to relieve her pain. The ER physician noted exacerbation of chronic pain and fibromyalgia, hypomagnesemia, probable urinary tract infection, peripheral edema of unclear origin, and chronic heavy narcotic and benzodiazepine use.  (R.148-50).  She went to the ER again on June 3, 2001 complaining of neck pain radiating down her right arm.  X-rays of the cervical spine showed no acute abnormalities.  She was given medication to relieve her pain.  (R.146-47).

2.  *Treating Providers*

Chiropractor John T. Hoehn began seeing Plaintiff on July 15, 1999, when she complained of chronic complaints regarding her neck and back after a fall from a horse and subsequent surgery.  She visited Dr. Hoehn the day after her July 20, 1999 motor vehicle accident, complaining of acute pain and tightness in the neck and back region. Most of her complaints were coming from the cervical region, with extremity complaints. She was treated until August 18, 1999, at which time she reported increased acute pain as a result of a second motor vehicle accident on August 11, 1999.  (R.155-56.)  X-rays taken the day of the accident showed unremarkable findings, and she was diagnosed with a strain/sprain of the cervical, thoracic, and lumbar regions.  (R.186.)  Her

subsequent complaints to Dr. Hoehn were more magnified in the neck, mid-back, and upper back regions.  Dr. Hoehn noted that "her range of motion was greatly hindered with hypersensitivity through palpitation and end points of range of motion in the areas of injury."  Dr. Hoehn referred Plaintiff to a psychiatrist for pain management.  Dr. Hoehn opined that Plaintiff reached maximum medical improvement on May 17, 2000. (R.155-56.)  In 2002, Dr. Hoehn opined that Plaintiff might not be able to return to her past occupational duties and that vocational rehabilitation might be beneficial.  (R.155-56.)  On September 1, 2004, Dr. Hoehn completed a form for the Florida Retirement system limiting Plaintiff to no lifting more than 20 pounds or excessive bending, sitting, or standing for long periods of time.  He also opined that Plaintiff had severe limitations on her functional capacity, was permanently incapable of any of work, and was totally and permanently disabled from gainful employment.  (R.516.)

Plaintiff received mental health care from Dr. Philip K. Springer from December 1998 through December 2002.  At her initial visit on December 10, 1998, she complained of worsening pain since back surgery.  She reported almost overdosing on Moscontin and stated that Lortab was not effective.  She had recently begun taking Wellbutrin.  Her medications were listed as Celexa 20 mg, Methadone 10 mg, Roxicet 5 mg, and Wellbutrin SR 150 mg.  Throughout her treatment with Dr. Springer she usually rated her pain either 8, 9, or 10 on a 1-10 scale. On June 28, 2000, Dr. Springer opined that Plaintiff was limited to light and sedentary activity restricted to less than 4 hours per day.  (R.361.)  Upon leaving treatment in December 2002, her diagnoses were major

depressive disorder, pain disorder, low back pain, pelvic region/thigh joint pain, and fibromyalgia.  Her mental health "appeared to be in fairly good shape."  Plaintiff's chronic pain was a significant problem but reached partial control with medication. (R.257-58.)

Plaintiff began treatment with her long-term physician Dr. May Montrichard in November 1999.  On July 30, 2002, Dr. Montrichard wrote a letter to an insurance company opining that Plaintiff was disabled due to chronic fibromyalgia, depression, and chronic lumbar and cervical pain and was not employable.  (R.446.)  On October 25, 2004, Dr. Montrichard completed a form for the Florida Retirement System describing Plaintiff's restrictions as no lifting more than 20 pounds and no standing or walking for long periods of time.  (R.502.)  On January 27, 2005, Dr. Montrichard wrote a letter to the Florida Retirement System wherein she opined that Plaintiff "is currently and permanently disabled, and not able to seek or maintain gainful employment." (R.498.)  Dr. Montrichard prepared a residual functional capacity evaluation in December 2009, assessing her functional capacity as it related to Plaintiff's condition during the insured period (1999-2004).  Dr. Montrichard opined that Plaintiff could sit for less than 30 minutes at a time, stand up to 15 minutes and lift up to 2 pounds occasionally.  (R.948-51.)  In December 2009, Dr. Montrichard also completed a "Clinical Assessment of Pain" form covering the insured period of 1999-2004.  She noted that Plaintiff had repeatedly complained of extreme pain, that from an objective standpoint the pain complaints were reasonable, the pain was physical in origin, and

that as a result Plaintiff had extreme limitations in her abilities to concentrate, perform scheduled activities, and complete a normal workday or workweek.  Dr. Montrichard also opined that Plaintiff had a marked inability to interact appropriately with the general public.  (R.956.)

At Shands Healthcare, Plaintiff received x-rays of her cervical and lumbar spine on July 12, 2001.  Degenerative changes of the lumbosacral spine with suggestion of bilateral spondylolysis at L5-S1 and degenerative changes of the cervical spine were noted.  (R.430-31.)  A June 2004 MRI of Plaintiff's cervical and lumbar spine revealed: "Straightening of the normal cervical lordosis with partial reversal of the normal upper lumbar lordosis most consistent with muscle spasm.  Mild degenerative changes without evidence of acute bony abnormality."  (R.513.)

Dr. George Feussner performed a neurological consultation of Plaintiff in September 2003 at the request of Dr. Hoehn.  Dr. Feussner interpreted an MRI of Plaintiff's cervical spine on September 4, 2003 and noted degenerative joint and disc disease at C5-6 with a mild degree of central herniation.  (R.461.)  On examination, he noted reduce range of motion of the cervical spine in all directions with pain and tenderness of the cervical paraspinous muscles indicating palpable spasm.  She had a positive Tinel's sign at the right wrist associated with reduced grip strength and a sensory distribution compatible with median nerve injury.  She had tenderness of the proximal muscles of all four extremities.  She was diagnosed with right carpal tunnel syndrome.  (R.467-68.)

### 3. State Agency and Consultative Physician Opinions

State agency physician Dr. Alejandro Vergara, a psychiatrist, completed a mental residual functional capacity assessment in January 2003 and found that Plaintiff had no episodes of decompensation, mild limitations in activities of daily living, and moderate limitations in maintaining social functioning and maintaining concentration, persistence, or pace.  (R.399.)

On March 27, 2003, Dr. Lance Chodosh examined Plaintiff as part of her disability determination.  Plaintiff reported radiating pain across her low back with an inability to sit for prolonged periods because of pain.  She also reported that on many days she was in too much pain to get out of bed and that she suffers from chronic depression.  Plaintiff reported capabilities in all aspects of self-care and activities of daily living, with limitations on walking, standing, and sitting due to pain.  Dr. Chodosh noted that Plaintiff was a relatively healthy-appearing and well-nourished woman of medium build who was fully oriented, had a normal speech pattern, appropriate thought content, and somewhat depressed affect with intermittent crying.  Plaintiff exhibited moderate pain behavior, somewhat limiting functional assessment.  Dr. Chodosh noted moderately decreased range of motion in the neck, full range of motion in the extremities with no edema, no deformity, tenderness, or paraspinal muscular spasm in her back.  Cranial nerve function was normal with motor function intact and strength 5 out of 5 throughout including grips; sensation, coordination, and dexterity were also normal.  Plaintiff's standing balance and gait were normal and she was able to squat

and rise.  Dr. Chodosh was of the opinion that Plaintiff had a normal ability to sit, stand

and walk, and she was able to bend, lift, carry, squat, kneel and crawl.  (R.433-36.)

State agency physician Dr. Jaime Puente performed a physical residual

functional capacity assessment in May 2003.  Dr. Puente opined that Plaintiff could lift

and carry up to 20 pounds occasionally and 10 pounds frequently; could stand and/or

walk with normal breaks for a total of about 6 hours in an 8-hour workday; and could

push and/or pull with no limitations.  Dr. Puente relied in part on the results of Dr.

Chodosh's physical examination.  (R.438-45.)

In October 2003, state agency psychologist Val Bee performed a psychiatric

review technique.  She opined that Plaintiff had mild limitations in her activities of daily

living and moderate limitations in maintaining social functioning and maintaining

concentration, persistence, and pace.  (R.479.)  Dr. Bee noted that most limitations

appear to be caused by chronic pain, which is primarily physical in etiology rather than

psychogenic.  (R.481.)  Dr. Bee found Dr. Springer's notes to be of minimal

interpretative value, but noted that Plaintiff had no psychiatric hospitalizations,

psychoses, or suicidal ideation that would suggest a propensity for mental

decompensation.  Dr. Bee concluded that Plaintiff's current activities of daily living

emphasize her physical limitations, noting that Plaintiff can cook simple meals, shop

when needed, do laundry, handle finances, and drive.  (R.482-83.)   Dr. Bee opined that

Plaintiff "appears mentally capable of well structured task activity" but might be poorly

suited for prolonged contact with the general public. (R.486-87.)  Dr. Bee also found

moderate limitations to Plaintiff's ability to complete a normal workday and workweek,

interact appropriately with the general public, and set realistic goals or make plans independently of others.  (R.485.)

Also in October 2003, state agency physician Dr. J. Vergo Attlesey completed a physical residual functional capacity assessment of Plaintiff.  Dr. Attlesey opined that Plaintiff could lift or carry up to 20 pounds occasionally and up to 10 pounds frequently; stand and/or walk about 6 hours in an 8-hour workday; and push or pull but with limitations in the upper extremities due to right carpal tunnel syndrome.  (R.489.)

**C.**     **Hearing Testimony**

Plaintiff's most recent hearing occurred on December 2, 2009.  At the time of the hearing, Plaintiff testified she was 50 years old, had completed one year of college, and previously worked as a word processing specialist for the Alachua County School Board.  She testified that she stopped that job on July 20, 1999 and has not worked since.  (R.1033.) Plaintiff testified that she began having problems in 1997 with fibromyalgia, a horse accident in 1997, a car accident on July 20, 1999, and back surgery.  (R.1034.)  She worked through her injuries after the horse accident and took six months' leave and had a supervisor who let her take frequent breaks and lay down if needed.  Plaintiff testified that after the horse accident and back surgery, the car accident resulted in multiple injuries, include a hurt neck, ruptured disks in her neck and low back, six to eight spurs on her spine, and a spur on her left hip.  (R.1035.)  She testified that after the car accident, she was unable to return to work.  Plaintiff testified that nothing has helped; her muscle spasms and pain are continuous.  Plaintiff also

testified that the fibromyalgia keeps her from sleeping.  She testified that since

December 2004 her condition has gotten much worse.  (R.1036.)  Plaintiff testified that

she lived with her husband and children during the relevant time period before

December 2004.  She testified that on most days she spent most of the day in bed,

watched television, and took pain pills.  (R.1037.)

Plaintiff testified she also had problems with depression between 1999 and

2004, and that she was put on at least three different anti-depressants until she

became suicidal around 1998 or 1999.  She testified that she has no social life and

doesn't go anywhere; she used to be in the church choir with family.  (R.1038.)

When examined by her representative, Plaintiff testified that she began receiving

state disability retirement soon after she stopped working in July 1999 due to

fibromyalgia, chronic pain, and depression.  (R.1039.) She testified that Dr. May

Montrichard is her treating physician and she sees her once a month.  (R.1039-40).

Vocational expert Dennis O'Connor testified that Plaintiff's two previous work

situations included one with the school board and one at a screen printing company.  At

the school board she was a word processing machine operator, which is considered

sedentary but as performed would be considered light.  (R.1042.)  As an office manager

at the screen printing company, the DOT job title would be general office clerk, which is

considered light exertionally, and semiskilled.  O'Connor testified that as Plaintiff

performed the job, she was supervisor, which would increase it to skilled as performed.

(R.1042-43.)

The ALJ asked O'Connor to consider an individual of Plaintiff's age, high school

education, and work experience with a hypothetical residual functional capacity

between the range of light and sedentary work.  The ALJ further described the

hypothetical RFC as standing and walking for six hours in an eight-hour period, the

ability to lift and carry limited to 10 pounds frequently, and requiring the opportunity to

sit or stand while remaining at the work station.  The individual should avoid stairs and

pushing or pulling with the lower extremities; constant handling or reaching would not

be permitted.  (R.1043.)   Exposure to hazards should be avoided, and the individual

should not operate a motor vehicle.  The individual is limited to simple work, with 1 to 3-

step, non-complex tasks.  The work should be low stress with only occasional changes

in the work setting.  (R.1045.)  The individual should not work in close proximity to

coworkers or in direct contact with the public.  (R.1045-46.)

    In response to the hypothetical, O'Connor testified that the hypothetical individual

could work as a sorter, which is considered unskilled, light work.  O'Connor testified

jobs as a sorter exist in the national economy at approximately 18,000 and in Florida at

750.  He testified that the hypothetical individual could also work as a charge account

clerk, which is considered unskilled, sedentary work.  O'Connor testified that jobs as a

charge account clerk exist nationally at approximately 36,000 and in Florida at 850.  He

testified that another sedentary job available for the hypothetical individual would be a

document preparer, which is considered sedentary and unskilled.  It exists in the

national economy at 15,000 and in Florida at 450.  (1047-48.)

    When asked about a hypothetical individual who retained the residual functional

capacity as stated but the individual had moderate limitations in maintaining activities of

daily living, social functioning, and concentration, persistence, and pace, O'Connor testified his previous answer would change because such a description was so broad, and that "moderate" may or may not be significant.  (R.1049.)  The ALJ noted that these limitations would not be expressly included the RFC but would be consistent with those limitations.  (R.1050.)  O'Connor testified that the jobs he suggested would not be done in isolation but would also not be done in close proximity to others.  (R.1052.)  O'Connor testified that if the hypothetical individual also had a marked inability in persistence and pace to complete a normal workday, he would not be able to suggest any jobs.  (R.1053-54).

## D.   <u>Findings of the ALJ</u>

The ALJ found that the Plaintiff did not engage in substantial gainful activity during the period from her alleged onset date of July 20, 1999 through her date last insured of December 31, 2004.  He found that the Plaintiff had the following severe impairments: degenerative disc disease of the cervical and lumbar spine; fibromyalgia; right carpal tunnel syndrome; obstructive sleep apnea; a depressive disorder; obesity; and a pain disorder.  The ALJ found that the severe impairments did not meet the Commissioner's Listings.  The ALJ found that Plaintiff has the residual functional capacity to: (1) stand and walk for up to 6 hours in an 8 hour workday; (2) lift and carry up to 10 pounds frequently; (3) frequently push or pull with the upper extremities within the 10 pound limit; (4) occasionally balance, stoop, crouch, kneel or crawl; (5) perform simple 1 to 3-step non-complex tasks in a low stress environment (only occasional change in the work setting).  The ALJ noted that sitting can be done throughout the

work day; Plaintiff must have the opportunity to sit and stand while at the work station; Plaintiff should not push or pull with the lower extremities; her right upper extremity should be limited to frequent reaching, fingering, and handling; she should avoid climbing ladders, ropes, and scaffolds, ascending and descending of stairs, exposure to hazards, moving machinery, holes, pits, and unprotected heights; she should not operate a motor vehicle; and she should not work in close proximity with coworkers or the public.  The ALJ found that Plaintiff was unable to perform any past relevant work. Finally, the ALJ found that there are jobs that exist in significant numbers in the national economy that the Plaintiff could perform and therefore is not disabled.

## IV.  Discussion

The Plaintiff challenges the ALJ's assessment of her residual functional capacity, arguing that (1) the ALJ did not appropriately assess Plaintiff's pain complaints, (2) the ALJ did not give Plaintiff's treating physicians' opinions appropriate weight; and (3) the ALJ did not give appropriate weight to the Florida Retirement System's decision to award Plaintiff disability benefits.

### A.    The ALJ properly assessed Plaintiff's pain complaints

Plaintiff argues that the ALJ improperly discredited Plaintiff's pain complaints and as a result, the residual functional capacity assessment is inaccurate.

It is well settled that the ALJ must consider all of a claimant's impairments, including her subjective symptoms, such as pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical

evidence.[21]  The Eleventh Circuit has set forth a three-part test for determining when a

disability may be established based on subjective complaints of pain.[22]  The "pain

standard" requires that the plaintiff first produce medical or other evidence of an

underlying medical condition.  Then the plaintiff must demonstrate either that objective

medical evidence confirms the severity of the alleged pain arising from that condition or

that the objectively determined medical condition is of such a severity that it can be

reasonably expected to give rise to the alleged pain.[23]  "Pain alone can be disabling,

even when its existence is unsupported by objective evidence."[24]  However, a claimant's

subjective complaints of pain do not conclusively establish a disability unless

accompanied by medical evidence.[25]

    If an ALJ decides not to credit a claimant's testimony about subjective

complaints, the ALJ must articulate specific and adequate reasons for doing so, or the

_____

[21] 20 C.F.R. § 404.1528.

[22] Landry v. Heckler, 782 F.2d 1551, 1553 (11th Cir. 1986).

[23] Id.

[24] Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987).

[25] 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms *shall not alone be conclusive evidence of disability* as defined in this section; there *must* be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability") (emphasis added).

*Case No: 1:10-cv-154-MP-GRJ*

record must be obvious as to the credibility finding.[26]  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.[27]

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.[28]  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding."[29]

In the instant case, the ALJ found that Plaintiff's complaints regarding the intensity, persistence, and limiting effects of her pain were not credible to the extent they conflicted with the ALJ's residual functional capacity assessment.  The ALJ noted that while objective evidence shows that Plaintiff has fibromyalgia, degenerative disc disease of the cervical and lumbar spine, and carpal tunnel syndrome, other evidence in the record does not support the conclusion that Plaintiff's pain was disabling within the relevant time period.  Specifically, the ALJ noted (1) findings from a June 2001 x-ray examination that showed no acute abnormalities in the cervical spine; (2) September

---

[26] Foote, 67 F.3d at 1561-62; Jones v. Department of Health and Human Servs., 941 F.2d 1529, 1532 (11th Cir. 1991) (finding that articulated reasons must be based on substantial evidence).

[27] Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986).

[28] Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982).

[29] Foote, 67 F.3d at 1562 (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983) (holding that although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court)).

2003 MRI scans showing some degenerative changes but no nerve root compression;
(3) June 2004 MRI scans showing only mild degenerative changes with no evidence of
acute bony abnormality; (4) Dr. Montrichard's physical exam reports showing essentially
normal findings; (5) Dr. Chodosh's examination results, which reported mildly
diminished range of motion of the cervical and lumbar spine, negative straight leg
raises, normal motor and grip strength, normal dexterity, normal sensation, normal gait,
and ability to balance, normally, heel and toe walk, and squat and rise; and (6)
Plaintiff's reported activities of daily living, which included preparing simple meals,
washing dishes, laundry, driving, and shopping.  (R.792-93.)

All of these reasons articulated by the ALJ are based upon substantial evidence
which fully supports the ALJ's conclusion that the level of pain and symptoms reported
by Plaintiff were inconsistent with the evidence of record. Accordingly, the Court
concludes that the ALJ applied the correct legal standards and articulated more than
adequate reasons for rejecting the Plaintiff's subjective complaints of pain.

**B.    The ALJ properly assessed the opinions of treating physicians**

Plaintiff argues that the ALJ erred in assigning little weight to the opinions of
treating physicians Dr. Montrichard, Dr. Springer and chiropractor Dr. Hoehn.

If a treating physician's opinion on the nature and severity of a claimant's
impairments is well-supported by medically acceptable clinical and laboratory diagnostic
techniques and is not inconsistent with the other substantial evidence in the record, the

ALJ must give it controlling weight.[30]  Nevertheless, the ALJ may discount the treating

physician's opinion if good cause exists to do so.[31]  Good cause may be found when the

opinion is "not bolstered by the evidence," the evidence "supports a contrary finding,"

the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight,"

the opinion is "inconsistent with [the treating physician's] own medical records," the

statement "contains no [supporting] clinical data or information," the opinion "is

unsubstantiated by any clinical or laboratory findings," or the opinion "is not

accompanied by objective medical evidence."[32]  If an ALJ rejects a treating physician's

opinion, he must give explicit, adequate reasons for so doing, and failure to do so

results in the opinion being deemed accepted as true as a matter of law.[33]

Plaintiff argues that the ALJ erred by failing to consider and properly weigh the

opinions of three of Plaintiff's treating physicians, Dr. Montrichard, Dr. Springer, and Dr.

Hoehn. However, contrary to Plaintiff's assertion, the ALJ clearly articulated his findings

regarding each doctor and clearly expressed the weight accorded to each opinion.

The ALJ expressly stated that she accorded Dr. Montrichard's opinions little

weight because (1) Dr. Montrichard did not reference objective signs to support her

---

[30]20 C.F.R. § 404.1527(d)(2).

[31] Hillsman v. Bowen, 804 F.2d 1179, 1181 (11th Cir. 1986).

[32]Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991), (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)).

[33] MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986); Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992).

opinions regarding Plaintiff's limitations; (2) supportive clinical findings were not present in Dr. Montrichard's records; and (3) "[t]he objective clinical evidence on physical examination and imaging reports. . .does not support the degree of limitations assessed by Dr. Montrichard."  (R.791-92.)

Similarly, with regard to Dr. Springer, the ALJ expressly stated the weight accorded Dr. Springer's opinions and the reasons for doing so.  The ALJ expressly stated that although Dr. Springer frequently noted Plaintiff's complaints of severe pain, Dr. Springer's notes do not reference any physical examination of the Plaintiff or cite clinical or objective findings or other medical evidence.  The ALJ concluded that Dr. Springer's "opinion is inconsistent with the substantial medical evidence. . ."  (R.792.)

With regard to the opinion of Dr. Hoehn, a chiropractor, the ALJ expressly stated while Dr. Hoehn's disability opinion is "entitled to some consideration and weight," it was not fully supported by the objective medical evidence and is not binding to an ALJ's disability determination.  Furthermore, the ALJ noted that a "chiropractor is not an 'acceptable medical source' whose opinions must be given controlling weight."[34]  In assigning Dr. Hoehn's opinion little weight, the ALJ also noted that "his treatment notes do not reference physical examination of the client or cite clinical and objective findings or other medical evidence."  (R.792.)

Although an ALJ generally must accord considerable weight to the opinions of treating physicians, this does not mean that the ALJ is bound to rely blindly on every

---

[34]See 20 C.F.R. § 404.1513.

statement offered by a doctor. Where the opinions of treating doctors are not supported by the medical evidence and the evidence supports a contrary finding, the ALJ is authorized to accord the opinions of treating physicians less weight and it is not reversible error where, as here, the ALJ articulates adequate and specific reasons for doing so that are supported by substantial evidence in the record. The ALJ has more than adequately done so in this case and, accordingly, the Court concludes that the ALJ did not err with regard to her consideration of the opinions of Plaintiff's treating physicians.

**C.      The ALJ properly assessed the disability determination of the FRS**

Plaintiff argues that the ALJ should have given "great weight" to the finding by the Florida Retirement System that Plaintiff is disabled.  However, the ALJ's decision to consider but give "little weight" to the disability determination is consistent with Social Security Ruling 06-03p.  "[E]vidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must considered" in determining disability.  However, an ALJ is "not bound by disability decisions of other governmental and nongovernmental agencies. . .[but] should explain the consideration given to these decisions. . ."[35]

 In the instant case, the ALJ explained that she considered the disability determination but gave it little weight because she was not bound by the Florida Retirement System's decision and because "no specifics or additional evidence has

---

[35]Soc. Security Ruling 06-03p, 2005 WL 2329939, at *6; 20 C.F.R. § 404.1504 and 416.904.

been offered in conjunction with the State's determination that would lead to a

conclusion different from reached in this decision." (R.792.)  Accordingly, the ALJ's

assignment of little weight to the FRS determination is supported by substantial

evidence and is consistent with Social Security Ruling 06-03p.

## V. <u>CONCLUSION</u>

For the foregoing reasons, it is respectfully **RECOMMENDED** that the decision of

the Commissioner denying benefits to Plaintiff should be **AFFIRMED.**

**IN CHAMBERS** at Gainesville, Florida, this 26th day of August, 2011.


*s/Gary R. Jones*

GARY R. JONES
United States Magistrate Judge


## <u>NOTICE TO THE PARTIES</u>

**Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.   Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**